UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY,<br>ALLSTATE INDEMNITY COMPANY,<br>ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, AND<br>ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY,<br><br>*Plaintiffs*,<br><br>vs.<br><br>EMED PHARMACY CORP.,<br>VADIM DOLSKY, AND<br>BENJAMIN PINHASOV,<br><br>*Defendants*. | No. 1:26-cv-07075 |

**PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company (collectively, "Allstate" and/or "Plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege against Defendants eMED Pharmacy Corp. ("eMED Pharmacy"), Vadim Dolsky ("Dolsky"), and Benjamin Pinhasov ("Pinhasov") (collectively, "Defendants") as follows:

## I. INTRODUCTION

1. The Defendants defrauded Allstate by seeking and collecting payment on fraudulent No-Fault claims involving prescription drugs purportedly dispensed by eMED Pharmacy.

2. eMED Pharmacy's No-Fault claims were fraudulent because the drugs were unnecessary, unwarranted, ineffective, and prescribed because of unlawful prescription referral and steering arrangements.

3. eMED Pharmacy was owned by Dolsky and Pinhasov during the relevant period.

4. Dolsky and Pinhasov are not licensed pharmacists.

5. Dolsky is an acupuncturist and the owner of numerous companies, including pharmacies, clinical laboratories, and an ambulatory surgery center. Dolsky also has a history of involvement in No-Fault fraud schemes.

6. Pinhasov holds an accounting degree, but began working for eMED Pharmacy as a pharmacy technician shortly after graduating college, and then became co-owner of eMED Pharmacy only after a few short months.

7. eMED Pharmacy operates from the grounds of a hospital owned by non-party Yan Moshe ("Moshe"), who is a childhood friend of Dolsky. Notably, Moshe has a long and well-documented history of involvement in No-Fault fraud schemes.

8. eMED Pharmacy was not eligible to collect payments under New York's No-Fault laws because it billed for drugs that were (a) not medically necessary, (b) ordered because of pre-determined protocols, (c) prescribed through prohibited referral and steering arrangements, and (d) dispensed pursuant to fraudulent prescriptions. As alleged herein, the Defendants violated applicable state and local licensing requirements by soliciting prescription orders from New York providers, and then steering the prescriptions to eMED Pharmacy in New Jersey, which deprived claimants of their choice of pharmacy. eMED Pharmacy also billed for non-prescription drugs, which are not covered under New York's No-Fault laws.

9. The Defendants' scheme relied on the U.S. Mail and interstate wires, which were used by the Defendants (and persons working under their direction and control) to transmit records, reports, bills, and other claim-related documents to Allstate in support of eMED Pharmacy's No-Fault claims.

10. The Defendants knew that eMED Pharmacy was ineligible to collect No-Fault payments, yet they still submitted (or caused the submission of) bills that falsely certified eMED Pharmacy's eligibility to collect payments under New York's No-Fault laws.

11. Allstate reasonably relied on the facial validity of the records and bills that were mailed or wired by the Defendants—and the representations contained therein—when making payments on eMED Pharmacy's No-Fault claims.

12. Allstate brings this action against the Defendants for: (a) violations of the RICO Act, 18 U.S.C. § 1961, *et seq*.; (b) common-law fraud; and (c) unjust enrichment.

13. This action seeks actual damages of more than $524,869.00 which represent No-Fault payments that Allstate was wrongfully induced to make to eMED Pharmacy during the course of this scheme.

14. Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to pay eMED Pharmacy (or any of their agents or attorneys) in connection with any No-Fault claims submitted to Allstate.

15. All of the acts and omissions of the Defendants described throughout this Complaint were undertaken intentionally.

16. The Defendants' fraudulent scheme was designed to elicit Allstate's payment of automobile insurance contract proceeds to eMED Pharmacy for the benefit of Dolsky and Pinhasov.

17. In each claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the Defendants sought—and in many instances obtained—payment for pharmacy services that were not compensable under New York's No-Fault laws.

18. The Defendants knew that the claimants identified in this Complaint were eligible for insurance coverage under automobile insurance policies issued by Allstate.

19. Allstate estimates that the Defendants purposely mailed or wired hundreds of documents in support of eMED Pharmacy's No-Fault claims even though the Defendants knew that eMED Pharmacy's claims were not compensable under New York's No-Fault laws.

## II. PARTIES

### A. PLAINTIFFS

20. Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal places of business in Northbrook, Illinois.

21. At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company were authorized to conduct business in New York.

### B. DEFENDANTS

#### 1. eMED Pharmacy Corp.

22. eMED Pharmacy is a New Jersey corporation with a principal place of business at 55 Meadowlands Pkwy, Secaucus, New Jersey.

23. eMED Pharmacy is registered to operate in New York as a nonresident pharmacy establishment.

### 2. <u>Vadim Dolsky</u>

24. Dolsky resides in and is a citizen of Puerto Rico.

25. Dolsky was a co-owner of eMED Pharmacy during the relevant period.

26. Dolsky lives in Florida and resides in Puerto Rico, but also travels to and is present in New York on a regular basis.

27. Dolsky is not a licensed pharmacist, and is not authorized to provide pharmacy services.

28. Dolsky is a licensed acupuncturist who purports to own and operate a surgery center, another pharmacy, and numerous acupuncture and testing companies; he also owns several other financing, real estate, consulting, and marketing companies.

29. Dolsky is linked to several No-Fault fraud schemes that involve billing for fraudulent and medically unnecessary services, including bogus pharmacy claims involving some of the same drugs billed for by eMED Pharmacy. *See Gov't Empls. Ins. Co. v. AV Chemists LLC*, No. 1:24-cv-05110 (E.D.N.Y.); *Allstate Ins. Co. v. Advanced Comprehensive Laboratory LLC*, No. 1:23-cv-06108 (E.D.N.Y.); *Liberty Mut. Mid Atlantic Ins. Co. v. Advanced Comprehensive Laboratory LLC*, No. 1:22-cv-03541 (E.D.N.Y.); *State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists, P.C., et al.*, No. 1:21-cv-05523 (E.D.N.Y.).

30. As alleged herein, Dolsky participated in the operation and management of eMED Pharmacy during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed by eMED Pharmacy in connection with the claimants at issue in this Complaint.

### 3. <u>Benjamin Pinhasov</u>

31. Pinhasov resides in and is a citizen of the State of New York.

32. Pinhasov is a co-owner of eMED Pharmacy.

33. Pinhasov earned an accounting degree before starting at eMED Pharmacy.

34. Pinhasov began working at eMED Pharmacy as a pharmacy technician, and was quickly recruited by Dolsky to become a co-owner of the company.

35. Pinhasov did not pay any money to acquire his share of eMED Pharmacy; instead, Pinhasov assumed eMED Pharmacy's liabilities as part of the deal, but was unable to identify any of the specific liabilities when questioned:

Q You took over the liabilities?
A Correct.
Q What were those?
A I don't remember. We can get back to you on that.

36. As alleged herein, Pinhasov participated in the operation and management of eMED Pharmacy during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed by eMED Pharmacy in connection with the claimants at issue in this Complaint.

## C. <u>RELEVANT NON-PARTIES</u>

37. Non-party Yan Moshe is not a physician, yet he controls a network of providers catering to No-Fault patients.

38. Non-party Hudson Regional Hospital ("Hudson Regional") is owned by non-party Yan Moshe. Hudson Regional is located in Secaucus, New Jersey. eMED Pharmacy operates from the premises of Hudson Regional. Several of eMED Pharmacy's No-Fault claims involve drugs reportedly prescribed by providers working at Hudson Regional.

39. Non-party 55 Meadowlands Holding LLC ("Meadowlands Holding") is another company owned by non-party Yan Moshe. Meadowlands Holding is located at the same address as Hudson Regional in Secaucus, New Jersey. Upon information and belief, Hudson Regional leases pharmacy space to Meadowlands Holding, which is used by eMED Pharmacy through an agreement with Meadowlands Holding.

40. Non-parties Citimed Surgery Center LLC (a/k/a CMSC LLC), Hackensack Specialty ASC LLC (f/k/a Dynamic Surgery Center LLC, f/k/a Excel Surgery Center LLC), Integrated Specialty ASC LLC (f/k/a HealthPlus Surgery Center LLC), and SCOB LLC (a/k/a SurgiCare of Brooklyn) (collectively, "Moshe ASCs") are ambulatory surgery centers owned by non-party Yan Moshe. The Moshe ASCs are located in New York and New Jersey. Many of eMED Pharmacy's No-Fault claims involve drugs reportedly prescribed by providers working at the Moshe ASCs, including drugs that were prescribed and delivered to claimants before they were even treated by the prescriber.

41. Non-party Regina Moshe M.D. is a physician and the sister of Yan Moshe.

42. Non-parties CitiMed 360 P.C., CitiMed Complete Medical Care P.C., CitiMed Services PA, CitiMedical I PLLC, and CitiMedical Services P.C. (collectively "CitiMed Entities") are a series of medical providers that specialize in the treatment of No-Fault claimants. The CitiMed Entities are registered under the name and medical license of non-party Regina Moshe M.D.; however, upon information and belief, the CitiMed Entities have also been owned and

controlled by non-party Yan Moshe.[1] A substantial number of eMED Pharmacy's No-Fault claims involve drugs reportedly prescribed by providers working for the CitiMed Entities.

43. At all relevant times, significant beneficial interests existed among eMED Pharmacy, Hudson Regional, the Moshe ASCs, and the CitiMed Entities when drug prescriptions were issued and steered to eMED Pharmacy.

## III. JURISDICTION AND VENUE

44. Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

45. Supplemental jurisdiction over the Plaintiffs' state law claims is proper under 28 U.S.C. § 1367.

46. Venue is proper under 28 U.SC. § 1391(b)(2) because a majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

47. At all relevant times, the Defendants engaged in purposeful activities in New York by targeting New York claimants, marketing eMED Pharmacy's services to New York prescribers, engaging in steering arrangements with New York providers, and seeking and submitting payment demands for claims made by eMED Pharmacy under New York's No-Fault laws, as detailed, *infra*.

48. The Defendants have availed themselves of New York law by filing frivolous collection actions against Allstate when eMED Pharmacy's fraudulent No-Fault claims were

---

[1] Moshe has an extensive history of involvement in other medical billing fraud schemes, including actions with claims that he illegally owned and controlled the CitiMed Entities and several other medical providers. *See Wesco Ins. Co. v. Liakis Law P.C.*, No. 1:26-cv-03300 (E.D.N.Y.); *Union Mut. Fire Ins. Co. v. Liakis Law P.C.*, No. 1:25-cv-01857 (E.D.N.Y.); *Liberty Mut. Mid Atlantic Ins. Co. v. Advanced Comprehensive Laboratory LLC*, No. 1:22-cv-03541 (E.D.N.Y.); *Allstate Ins. Co. v. Metro Pain Specialists P.C.*, No. 1:21-cv-05586 (E.D.N.Y.); *State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists P.C.*, No. 1:21-cv-05523 (E.D.N.Y.); *Gov't Empls. Ins. Co. v. Moshe*, No. 1:20-cv-01098 (E.D.N.Y.); *Allstate Ins. Co. v. Ilyaich*, No. 1:13-cv-05464 (E.D.N.Y.); *Liberty Mut. Ins. Co. v. Nexray Medical Imaging P.C.*, No. 1:12-cv-05666 (E.D.N.Y.); *Gov't Empls. Ins. Co. v. Ushyarov*, No. 1:11-cv-03657 (E.D.N.Y.); *Gov't Empls. Ins. Co. v. New Hyde Park Imaging P.C.*, No. 1:11-cv-01166 (E.D.N.Y.); and *Travelers Indem. Co. v. Liberty Med. Imaging Assoc. P.C.*, No. 1:07-cv-02519 (E.D.N.Y.).

denied or not fully paid. The Defendants' scheme was financed using proceeds collected from Allstate on fraudulent No-Fault claims.

49. The Defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

50. Overall, the Defendants' scheme to defraud is tied to the State of New York, which means that the ends of justice are best served through this Court's exercise of jurisdiction over the Defendants.

## IV. APPLICABLE LAW

51. New York claimants were ideal targets because each one is eligible for at least $50,000.00 in coverage for necessary medical and pharmacy expenses, and because claimants can assign their No-Fault benefits directly to pharmacies. These assignments allow pharmacies to seek payment directly from the claimant's insurer, which eMED Pharmacy did in this case. *See* N.Y. Ins. Law § 5101, *et seq*.; 11 N.Y.C.R.R. § 65, *et seq*.) (collectively, "New York's No-Fault laws").

52. Pharmacies are not eligible to collect payment under New York's No-Fault laws if they fail "to meet ***any*** applicable New York State or local licensing requirement necessary to perform such services in New York," or fail "to meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed." 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

53. The Defendants' scheme was aimed at exploiting New York claimants; indeed, the Defendants focused on generating New York No-Fault claims through marketing efforts aimed at providers working in New York. In many cases, the providers were caused to prescribe drugs for claimants who were treating at facilities owned by non-party Moshe.

54. However, because the Defendants operated eMED Pharmacy from New Jersey, they were also obligated to comply with New Jersey law.

55. As detailed below, the Defendants' scheme caused eMED Pharmacy to violate applicable New York and New Jersey licensing requirements, which means that eMED Pharmacy was ineligible to collect payments under New York's No-Fault laws.

### A. New York

56. eMED Pharmacy operates from New Jersey so it is considered a "nonresident establishment" under New York law, which is defined as any pharmacy located outside of New York that "ships, mails, or delivers prescription drugs" to patients or prescribers residing in New York. *See* N.Y. Education Law § 6808-b(1); 8 N.Y.C.R.R.§ 63.8(a)(1).

57. All nonresident establishments must be registered with New York's Board of Pharmacy, and must also meet all applicable requirements of New York's Education Law. *See* N.Y. Education Law § 6808-b(2).

58. Pharmacies can submit claims for No-Fault payments directly to an insurance company if they obtain a duly executed assignment from the claimant. Claims can be submitted using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

59. Pharmacies make material misrepresentations when they submit bills that omit or misrepresent material information about the services or their eligibility to collect No-Fault payments.

60. It is a material misrepresentation to submit bills for drugs that are (a) never provided, (b) not medically necessary, (c) prescribed because of unlawful referral arrangements, (d) dispensed in violation of applicable licensing laws, and (e) billed at grossly excessive rates.

61. The New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule"), which includes fees applicable to pharmacies and prescription drugs is set forth under 12 N.Y.C.R.R. § 440.1, *et seq*.

62. Representations about compliance with the Fee Schedule are material because insurers rely on the Fee Schedule to determine the proper payment amount on eligible claims.

63. Pharmacies may charge no more than the lesser of (a) the calculated cost of the drug, or (b) the usual and customary price of the drug.

64. "Calculated cost means the average wholesale price ["AWP"][2] for the national drug code ["NDC"][3] of the prescription drug or medicine on the day it was dispensed plus a dispensing fee. For brand name drugs the calculated cost shall be AWP minus 12 percent of the average wholesale price plus a dispensing fee of $4. For generic drugs the calculated cost shall be AWP minus 20 percent plus a dispensing fee of $5." 12 N.Y.C.R.R. § 440.2(c).

65. "Usual and customary price means the retail price charged to the general public for a prescription drug." 12 N.Y.C.R.R. § 440.2(s).

66. Pharmacies are prohibited from billing in excess of the Fee Schedule under New York's No-Fault laws.

67. To operate in New York, nonresident establishments must also be licensed and/or registered with their state of residence, and must "maintain, in readily retrievable form, records of

---

[2] AWP refers to the prices provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health, or any successor publisher, on the day a drug is dispensed. *See* 12 N.Y.C.R.R. § 440.2(a).

[3] National Drug Codes ("NDCs") are unique 10-digit, 3-segment numeric identifiers assigned to each drug that reflects the vendor of the drug, identifies the drug itself, and indicates the quantity in which the drug is packaged. Each NDC number has a corresponding AWP, which identifies the price.

drugs and/or devices shipped into New York State." *See* N.Y. Education Law § 6808-b(4); 8 N.Y.C.R.R.§ 63.8(b)(5).

68. Nonresident establishments must also comply with all statutory and regulatory requirements of the state where the nonresident establishment is located. N.Y. Education Law § 6808-b(4)(d).

## B. NEW JERSEY

### 1. Pharmacy Laws and Regulations

69. eMED Pharmacy is considered a "pharmacy practice site" under New Jersey law, which is defined as any place in New Jersey "where drugs are dispensed or pharmaceutical care is provided by a licensed pharmacist." *See* N.J. Stat. § 45:14-41.

70. To operate in New Jersey, all pharmacy practice sites must obtain a permit from the New Jersey State Board of Pharmacy, and must also renew their permit on an annual basis. *See* N.J. Stat. § 45:14-69(a).

71. New Jersey law requires that "[e]ach holder of a pharmacy practice site permit shall ensure that a licensed pharmacist be immediately available on the premises to provide pharmacy services at all times the pharmacy practice site is open." N.J. Stat. § 45:14-69(d).

72. Under New Jersey's Pharmacy Practice Act, a pharmacy practice site permit may be suspended, revoked, denied, restricted, or refused if the permit holder engaged in conduct that "is violative of any federal, State or local laws or regulations relating to the practice of pharmacy." N.J. Stat. § 45:14-75(b)(1).

73. Accordingly, pharmacies fail to comply with applicable New Jersey licensing requirements if they violate any federal or state laws or regulations pertaining to pharmacies, including New Jersey's laws preventing prescription steering and certain types of patient referrals.

74. Moreover, each pharmacy practice site in New Jersey must have a pharmacist-in-charge, and both the "pharmacist-in-charge and the owner of a pharmacy practice site shall be responsible for any violation of any laws or regulations pertaining to the practice of pharmacy." N.J. Stat. § 45:14-69(e).

75. A pharmacy practice site's permit may be denied, suspended, revoked, restricted, or not renewed if the pharmacy fails to comply with applicable New Jersey laws, rules, or regulations. *See* N.J. Stat. § 45:14-69(g).

76. Specifically, the New Jersey State Board of Pharmacy may suspend, revoke, deny, restrict, or refuse to renew a pharmacy practice site's permit for numerous reasons, including (a) utilizing a permit to obtain remuneration by fraud, misrepresentation or deception, or (b) conduct that violates any federal, State or local laws or regulations relating to the practice of pharmacy. *See* N.J. Stat. § 45:14-75(b).

77. Under New Jersey law, pharmacy technicians may assist a licensed pharmacist in (a) retrieval of patient and prescription records, (b) data entry, (c) label preparation, and (d) counting medication, including use of an automated medication system. *See* N.J. Stat. § 45:14-80(a).

78. However, New Jersey law prohibits pharmacy technicians from (a) receiving new verbal prescriptions, (b) providing patient counseling, or (c) engaging in prospective drug review. *See* N.J. Stat. § 45:14-80(c).

79. In New Jersey, pharmacists must conduct a drug utilization review before each new medication is dispensed or delivered to a patient, which includes evaluating prescription drug orders and patient records for: (a) proper utilization, including over- or under-utilization; (b) duplication of therapy; and (c) potential interactions and adverse reactions. *See* N.J. Stat. § 45:14-

41; N.J. Stat. § 45:14-66. Pharmacists are also required to conduct a drug utilization review before refilling a prescription order. *Id*.

80. Before dispensing a new drug, pharmacists must offer to provide counseling to patients or their caregivers about (a) the name and description of the drug, (b) the dosage and route of administration, (c) common adverse side effects or interactions, and (d) refill information. *See* N.J. Stat. § 45:14-67; N.J.A.C. § 13:39-7.21(a).

81. Drug counseling shall only be performed by a licensed pharmacist or a pharmacy intern working under the immediate personal supervision of a licensed pharmacist. *See* N.J.A.C. § 13:39-7.21(b).

82. If patients are not physically present when drugs are dispensed, then the offer to counsel must be "made by telephone or in writing on a separate document accompanying the prescription. A written offer to counsel shall be in bold print, easily read, and shall include the hours a pharmacist is available and a telephone number where a pharmacist may be reached. The telephone service must be available at no cost to the pharmacy's primary patient population." *See* N.J.A.C. § 13:39-7.21(d).

83. When drugs are dispensed, the pharmacist must document that counseling was provided or refused. *See* N.J.A.C. § 13:39-7.21(e).

**2. <u>Unlawful Referrals</u>**

84. Under New Jersey law, pharmacies are prohibited from "steering," which makes it illegal for a pharmacy "to enter into an arrangement with a practitioner, or any institution, facility, or entity that provides health care services, for the purpose of directing or diverting patients to or from a specified pharmacy for the filling of prescriptions or restraining in any way a patient's freedom of choice to select a pharmacy." *See* N.J.A.C. § 13:39-4.17.

85. Under N.J. Stat. § 45:9-22.5(a) (i.e., the "New Jersey Codey Law"), practitioners are prohibited from referring a patient to a "health care service" in which the practitioner (or an immediate family member) has a "significant beneficial interest," except under limited circumstances not present in this case.

86. Under the New Jersey Codey Law, a "practitioner" means a physician, chiropractor or podiatrist licensed under New Jersey law. *See* N.J. Stat. § 45:9-22.4. Pharmacies are specifically included under the definition of "health care service." *See id.*

87. The term "immediate family" means "the practitioner's spouse and children, the practitioner's siblings and parents, the practitioner's spouse's siblings and parents, and the spouses of the practitioner's children." N.J. Stat. § 45:9-22.4.

88. "Significant beneficial interest" means "***<u>any financial interest</u>***; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, payments made by a hospital to a physician pursuant to a hospital and physician incentive plan, or any interest held in publicly traded securities." N.J. Stat. § 45:9-22.4.

89. Importantly, pharmacies operate in violation of New Jersey state law relating to the practice of pharmacy (e.g., the Pharmacy Practice Act) when they participate in patient referral arrangements that are prohibited under the New Jersey Codey Law.

## V. <u>SPECIFIC FACTS ABOUT DEFENDANTS' SCHEME TO DEFRAUD</u>

90. The success of the Defendants' scheme was tied to eMED Pharmacy's ability to generate prescription referrals from medical providers, which was accomplished through unlawful marketing efforts and prohibited referral arrangements involving providers who worked for Hudson Regional, the Moshe ASCs, and the CitiMed Entities.

91. eMED Pharmacy's ownership structure helped promote this scheme.

92. Dolsky was an owner of eMED Pharmacy throughout the scheme, but was rarely physically present.

93. Dolsky's friendship with non-party Yan Moshe helped eMED Pharmacy become enmeshed with Hudson Regional, Meadowlands Holding, the Moshe ASCs, and the CitiMed Entities.

94. Dolsky and non-party Yan Moshe also have extensive financial ties. For example, Dolsky allegedly owns a medical billing company that received over $13 million in payments from companies associated with non-parties Yan Moshe and Regina Moshe M.D., most of which were transferred to Dolsky's personal bank accounts. *See State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists P.C.*, No. 1:21-cv-05523 (E.D.N.Y.), at ECF No. 501. Over $5 million of those payments were made by non-party Citimed Management Services Inc., which is a shell company that siphoned money from the CitiMed Entities, even though no legitimate services were provided. *Id*. Nearly $3 million of the proceeds paid to Dolsky were eventually transferred to another entity owned by Dolsky, non-party Green Hills Ltd LLC. *Id*. Notably, Pinhasov testified that eMED Pharmacy engaged in wholesale drug purchases with a similarly-named entity:

Q While we're on the topic, do you know all the wholesalers that eMed uses --
A Yes.
Q -- currently?
A Yes.
Q Can you please tell me?
A Yes, Kinray -- I can spell that if you need to.
Q Please.
A K-I-N-R-A-Y.
Anda, A-N-D-A.
Green Hill Trading.
Q Can you repeat that for me, please?
A Green Hill Trading. And I could be wrong with the name.

**A. <u>VIOLATIONS OF THE NEW JERSEY CODEY LAW</u>**

95. eMED Pharmacy operates from inside of Hudson Regional, which is located in Secaucus, New Jersey:




96. eMED Pharmacy's ability to operate was partly dependent upon a "Timeshare License Agreement" with Hudson Regional, which is owned by non-party Yan Moshe.

97. Importantly, the "Timeshare License Agreement" between eMED Pharmacy and Hudson Regional is not a real lease because it prevents eMED Pharmacy's exclusive use of the space. The agreement itself is a sham because it only gives eMED Pharmacy permission to conduct "administrative functions," not to operate a full-fledged pharmacy from the premises:

> 2. USE OF PREMISES. Licensee agrees that the Premises shall be used solely for the purpose of conducting, on a timeshare basis, administrative functions, in compliance with all applicable laws and regulations. Licensee shall have the exclusive use of the Premises during the designated sessions, but after such designated session, others may utilize the Premises and the furniture, fixtures, and equipment located therein if any.

98. Indeed, eMED Pharmacy's use of the space at Hudson Regional was limited to morning and afternoon "blocks" on Monday through Thursday, and a morning block on Friday.

99. However, eMED Pharmacy's hours of operation extended beyond these specified periods, according to Pinhasov:

Q What are eMed's hours of operation?
A 9:00 to 7:00, Monday through Friday. Saturday 10:00 to 6:00 p.m. Sunday we are closed.

100. When asked about the license fee, Pinhasov stated that eMED Pharmacy actually pays Hudson Regional approximately $4,895.00 per month to operate on premises. According to Pinhasov, eMED Pharmacy purportedly maintained a different agreement with Hudson Regional for use of pharmacy space, but no such agreement was ever produced.[4]

101. When asked about eMED Pharmacy's contract negotiations with Hudson Regional, Pinhasov did not respond:

[4] Upon information and belief, Dolsky was referring to a separate lease agreement that eMED Pharmacy entered into with Meadowlands Holding for the use of outpatient pharmacy space at Hudson Regional. As noted above, Meadowlands Holding is also owned by non-party Yan Moshe, which means all of the pharmacy and office space used by eMED Pharmacy was controlled by Moshe or one of his companies.

Q Who negotiates the contracts on behalf of eMed with Hudson Regional?

A (No response.)

102. At all relevant times, significant beneficial interests existed between Hudson Regional and eMED Pharmacy for the purposes of the New Jersey Codey Law.

103. Hudson Regional is paid by eMED Pharmacy on monthly basis; in exchange, eMED Pharmacy is permitted to use the premises and obtain prescription referrals from Hudson Regional providers, along with referrals from other providers working for the Moshe ASCs and the CitiMed Entities. Hudson Regional is also, upon information and belief, the ultimate beneficiary of eMED Pharmacy's payments to Meadowlands Holding for the lease of outpatient pharmacy space.

104. For example, on July 26, 2024, a series of prescriptions for claimant A.L. (claim no. 0754893311) were steered to eMED Pharmacy by non-party provider Alexandra Carrer M.D. ("Carrer"), who had an address of 55 Meadowlands Parkway, Secaucus, NJ, which is the location of Hudson Regional:

**eMED Pharmacy Corp.**
55 Meadowlands Pkwy Secaucus, NJ 07094
Phone: (201)293-4389 Fax: (201)293-4263 7/31/2024 1:59:03PM

Rx Pres: Alexandra Carrer
Ord Date 07/26/2024
NPI# 1902047343
55 MEADOWLANDS PARKWAY
LIC#: 25MA09170200
SECAUCUS, NJ 07094
DEA#: FC3471808
Phone: (844)666-2774 Fax: (201)392-3571 SPI#

Patient: L[redacted], A[redacted]

105. A.L.'s prescriptions were transmitted to eMED Pharmacy by telephone even though A.L. was not seen by Carrer on July 26, 2024. In reality, A.L. was reportedly examined by Carrer on July 16, 2024, and was ordered to undergo right shoulder surgery. Notably, Carrer did not order any prescription drugs, according to the exam report.

106. On July 29, 2024, A.L. reportedly underwent surgery with Carrer at non-party SCOB LLC—one of the Moshe ASCs.

107. According to Pinhasov, Carrer was "onboarded" by one of eMED Pharmacy's marketers (non-party John Tracy):

Q Do you know Dr. Carrer's first name?

A Yes.

Q What is it?

A Alexandra.

Q Okay.

And does Alexandra Carrer refer to eMed as well?

A Yes.

Q Was she onboarded by John or Dan?

A She was onboarded by John.

108. Prescriptions reportedly issued by Carrer at Hudson Regional were referred to eMED Pharmacy, including the prescription for A.L.

109. The prescriptions referred from Hudson Regional to eMED Pharmacy violated the New Jersey Codey Law, which means that none of eMED Pharmacy's claims involving those prescriptions are compensable under New York's No-Fault laws.

110. The Defendants knew there was a referral pipeline between eMED Pharmacy and Hudson Regional providers, as confirmed by Pinhasov when questioned about a different set of prescriptions from Carrer for claimant E.Y. (claim no. 0749808639):

Now, on this one -- right -- we're on page 6 now -- so Alexandra Carrer is prescribing from 55 Meadowlands Parkway; is that correct?

A That is correct.

Q So she was prescribing this from Hudson Regional Hospital?

A That's her address on the prescription.

Q Okay.

That is the same address as your pharmacy; correct, sir?

A That is correct.

111. The same is true for non-party Jeffrey Guttman M.D., a physician who reportedly issued prescriptions sent to eMED Pharmacy while working for Hudson Regional and other Moshe-associated providers, as confirmed by Pinhasov:

A Jeffrey Guttman was -- is a Hudson surgeon who does procedures in Hudson. So he was not onboarded by John or Dan; he actually comes to the hospital.

112. eMED Pharmacy also received prescription referrals from providers working for the CitiMed Entities and/or the Moshe ASCs.

113. Prescriptions from the Moshe ASCs were in violation of the New Jersey Codey Law because the prescribing providers worked for companies that were owned by non-party Yan Moshe, who had a significant financial interest in eMED Pharmacy through the Hudson Regional-eMED Pharmacy arrangement.

114. Likewise, the prescriptions from the CitiMed Entities were also in violation of the New Jersey Codey Law because the prescribing providers worked for companies that were owned by non-party Regina Moshe M.D., whose immediate family member (non-party Yan Moshe) had a significant financial interest in eMED Pharmacy.

115. Accordingly, all eMED Pharmacy claims involving drugs prescribed by providers working for Hudson Regional, the Moshe ASC and the CitiMed Entities are prohibited under the New Jersey Codey Law, which means all such claims are not compensable under New York's No-Fault laws.

### B. UNLAWFUL STEERING

116. eMED Pharmacy was unable to bill for No-Fault payments without prescriptions from licensed medical providers, which incentivized the Defendants to engage in unlawful steering arrangements with providers who worked for Hudson Regional, the Moshe ASCs, and the CitiMed Entities.

117. The Defendants employed marketers for the purpose of securing prescription referrals from providers. According to Pinhasov, the marketers maintained relationships with prescribers to ensure that their prescriptions were steered to eMED Pharmacy.

118. Pinhasov was directly involved in eMED Pharmacy's marketing scheme; indeed, he was responsible for "onboarding" several of the prescribing providers involved in this scheme, including providers that worked for the CitiMed Entities.

119. According to Pinhasov, eMED Pharmacy's marketers were paid productivity bonuses based on the volume of prescriptions steered to eMED Pharmacy, which was the case with non-party John Tracy:

> Q So John's higher performance structure was based on the total amount of prescriptions, ultimately, that the pharmacy issued?
>
> A Correct. Dispensed.

120. At all relevant times, eMED Pharmacy violated New Jersey law prohibiting pharmacies from engaging in prescription steering arrangements with prescribers.

121. Accordingly, all claims involving drugs prescribed by providers working for Hudson Regional, the Moshe ASCs, and the CitiMed Entities were steered to eMED Pharmacy in violation of New Jersey law, which means all such claims are not compensable under New York's No-Fault laws.

## C. Fraudulent Prescriptions

122. The Defendants exploited a loophole in New York's pharmacy laws, which require electronic prescriptions for all drugs, except under certain circumstances. N.Y. Educ. Law § 6810(10); N.Y. Pub. Health Law § 281(3). New York's electronic prescription mandate was intended to reduce prescription drug fraud and misuse because "E-prescribing is a secure method of transmitting prescriptions from practitioners to pharmacists. Since an e-prescription cannot be physically altered, forged, or stolen …, it curtails prescription fraud." N.Y. Senate Bill S7637 (2011-2012 Leg. Session).

123. All pharmacies licensed in New York are required to follow the electronic prescription mandate, except in cases of temporary system failure, waiver, or exigent circumstances. N.Y. Pub. Health Law § 281(3)(a)-(d).

124. An exemption from the electronic prescription mandate also arises when an in-state provider issues a prescription to an out-of-state pharmacy. N.Y. Pub. Health Law § 281(3)(e).

125. The Defendants took advantage of eMED Pharmacy's location in New Jersey to use telephone prescriptions to generate billing.

126. The Defendants knew eMED Pharmacy was exempt from New York's electronic prescription requirements; in fact, Pinhasov was able to recite the law verbatim:

Are you aware of the New York law requiring a mandate for electronic prescriptions?

A Yes, but I'm also aware that it's -- for an outside pharmacy, it's based on the law of the pharmacy where it is licensed as the home state.

Q Okay.

A And I can actually, if you'd like, I can actually quote you the law word for word as well.

127. According to Pinhasov, telephone prescriptions were preferred because eMED Pharmacy could bill for the drugs without having a prescription signed by the provider:

But there's no signature from the actual referring provider; is that correct?

A Signature is not required for a telephone order.

128. The ability to use telephone prescriptions helped propel the scheme. In many cases, eMED Pharmacy submitted bogus claims, including cases where the telephone prescriptions were not substantiated by the prescriber's own medical records.

129. For example, on March 30, 2024, eMED Pharmacy billed for drugs in connection with claimant H.R. (claim no. 0722672011), namely esomeprazole magnesium, naproxen, ondansetron, Percocet, and docusate sodium.

130. eMED Pharmacy's bills for H.R. were supported by telephone prescriptions reportedly issued by non-party Jeffrey Guttman M.D., who was a physician working for CitiMed.

131. The telephone prescriptions were not signed by Guttman; instead, the prescriptions were signed by an eMED Pharmacy pharmacist.

132. eMED Pharmacy's claims for H.R. are fraudulent to the extent they are based on prescriptions that were not actually issued by the prescribing provider.

133. For example, the prescriptions were issued to eMED Pharmacy on March 21, 2024 even though H.R. did not see Guttman that day; the prescriptions were issued in advance of a surgical procedure to be performed by Guttman at Hudson Regional on March 30, 2024.

134. However, according to an April 4, 2024 post-operative examination report from Guttman, which was after eMED Pharmacy billed for the drugs, H.R. was not taking any of the drugs reportedly ordered by Guttman:

> **MEDICATION:** Atorvastatin, metoprolol, amlodipine, tamsulosin 0.4 mg, folic acid 2 mg, Prasugrel 10 mg, methotrexate 2.5 mg, and Remicade infusion.

135. Moreover, the only drug that Guttman ordered for H.R. was Tylenol, which is a brand-name version of acetaminophen—an over-the-counter drug that is available without a prescription:

**PLAN OF CARE:**

1. The diagnosis was explained to the patient sufficiently that the patient understands the pathology, possible etiology, symptoms, prognosis and outcome with and without the treatment. The risks, benefits and alternatives of the treatment plan were discussed in great detail including operative versus non operative management.
2. Nonoperative management was also discussed to include physical therapy, injections, home exercises program, oral medications and other alternatives.
3. At this time, the patient will be referred for a course of Physical Therapy, start PROM/pendulum for the next 2 weeks, increase strength and range of motion with additional focus on modalities and ancillary treatments including but not limited to ultrasound, cold compression therapy and massage, with the goal to restore the patient to their baseline functional status.
4. Sutures removed, bacitracin and Band Aids applied onto left shoulder.
5. Medications: Over-the-counter Tylenol p.r.n.
6. Home exercise program is to be performed daily as explained by the physician assistant today.

136. Pinhasov even acknowledged that Gutman's exam report did not indicate any prescriptions:

Q And these telephonic prescriptions on page 13 -- right -- who are they issued by?
A Jeffrey Guttman.
Q But he makes no reference to them in a report five days or four days after they were given to the patient; did you notice that?
A Correct.

137. Despite Gutman's limited order, eMED Pharmacy still billed Allstate for 5 different drugs reportedly delivered to H.R.

138. When asked to explain the potential fraudulence of eMED Pharmacy's bills for H.R., Pinhasov had no response:

```
     Q     Is it possible that Dr. Guttman
did not prescribe these medications?
     A     No.
     Q     How so?
     A     (No response.)
```

**D. <u>BILLING FOR UNNECESSARY DRUGS</u>**

139. As part of this scheme, prescribers were caused to prescribe predetermined sets of drugs, including topical gels and oral pain medications. The scheme was designed to push expensive prescription drugs even though substantially similar products were available over-the-counter (i.e., without a prescription) and at a fraction of the cost, which helped the Defendants maximize payments in connection with eMED Pharmacy's No-Fault claims.

140. The Defendants used eMED Pharmacy's marketers and their connections to Moshe-affiliated providers to ensure that prescriptions for these drugs were ordered and steered to eMED Pharmacy in all cases, regardless of whether claimants even needed or wanted the drugs.

**1. <u>Topicals</u>**

141. Drugs may be prescribed in a topical form when a claimant has specific allergies or is incapable of swallowing pills; however, topical pain medications, including topical NSAIDs, lack proven effectiveness for the treatment of widespread musculoskeletal pain.

142. In this case, eMED Pharmacy claimants were prescribed topical and oral NSAIDs for the treatment of musculoskeletal pain despite the lack of evidence of an intolerance to oral NSAIDs or muscle relaxants.

143. The specific drugs billed by eMED Pharmacy are not approved or intended to treat musculoskeletal injuries; rather, they are approved for the treatment of superficial pain, skin conditions, or nerve pain.

144. Less toxic formulations of these drugs are available over the counter at significantly lower cost, particularly topical lidocaine and diclofenac sodium.

**a. *Diclofenac***

145. eMED Pharmacy billed for diclofenac sodium 1% gel as part of this scheme.

146. Notably, diclofenac sodium 1% gel is only FDA-approved for the treatment of knee pain caused by osteoarthritis; indeed, diclofenac sodium 1% gel has no proven efficacy for pain relief for larger and deeper joints, such as the spine or shoulder.

147. Diclofenac sodium 1% gel is also not effective for treating pain in multiple areas, even though the drug was prescribed to Allstate claimants for this reason.

148. Despite these known limitations, eMED Pharmacy still billed for diclofenac sodium 1% gel even though there was no documented evidence that the claimants were suffering from osteoarthritis of the knees.

149. The Defendants also caused eMED Pharmacy to bill for diclofenac sodium 1% gel as a prescription drug even though generic diclofenac sodium 1% gel is available without a prescription.

150. In some cases, eMED Pharmacy also billed for diclofenac sodium 2% spray, which was also not effective for treating the claimants' reported injuries.

151. Notably, the Fee Schedule calls for reimbursement of diclofenac sodium 2% topical spray at a much higher rate than diclofenac sodium 1% gel even though both drugs were equally ineffective.

152. For example, eMED Pharmacy billed Allstate over $2,154.00 for a 30-day supply diclofenac sodium 2% topical spray (NDC 65162-0683-12) in connection with several Allstate claimants, including, but not limited to, the following: E.L. (claim no. 0790524904); V.H. (claim no. 0761614916); C.C. (claim no. 0758805311).

153. The same supply of diclofenac sodium 2% topical spray (NDC 65162-0683-12) could be acquired from wholesalers for around $350.00 during the relevant period.

154. eMED Pharmacy's bills for diclofenac sodium 1% gel and diclofenac sodium 2% topical spray, including the bills identified in Exhibit 1, are fraudulent and traveled through the U.S. Mail and/or interstate wires.

**b. *Lidocaine***

155. eMED Pharmacy also billed for lidocaine 5% ointment.

156. Lidocaine 5% ointment is not a first-line treatment for musculoskeletal pain; rather, it is indicated for temporary pain relief for minor burns, skin abrasions, insect bites, and as a topical anesthetic.

157. Indeed, the product labeling for lidocaine 5% ointment indicates that the drug is not effective when applied on intact skin because the drug is incapable of sufficiently penetrating intact skin. As a result, high concentrations of the drug must be used in the limited cases where it is warranted, such as adults suffering from neuropathic pain.

158. eMED Pharmacy claimants who were prescribed lidocaine 5% ointment did not have any documented minor skin conditions or true neuropathic pain, which would warrant the use of lidocaine 5% ointment.

159. Moreover, lidocaine 4% cream—sold under the brand name Aspercreme—is sold over-the-counter without a prescription at a fraction of the price charged by eMED Pharmacy for the lidocaine 5% ointment.

160. eMED Pharmacy's bills for lidocaine 5% ointment, including the bills identified in Exhibit 1, are fraudulent and traveled through the U.S. Mail and/or interstate wires.

### 2. Esomeprazole and Naproxen

161. Allstate claimants were also prescribed esomeprazole magnesium and naproxen as part of the scheme.

162. Esomeprazole is a proton-pump inhibitor.

163. Naproxen is a non-steroidal anti-inflammatory drug used for pain relief.

164. Both are generic drugs, which are available for purchase without a prescription.

165. However, these drugs were pushed to claimants regardless of medical need as part of a predetermined prescription protocol.

166. Esomeprazole and naproxen were ideal drugs to exploit because eMED Pharmacy could acquire them at low prices but then bill for them at high prices under the Fee Schedule.

167. For example, on May 23, 2024, eMED Pharmacy billed Allstate $414.07 for esomeprazole 20mg (NDC 00093-6450-98) and $59.33 for naproxen 500mg (NDC 65862-0522-05) in connection with claimant S.M. (claim no. 0725280879).

168. However, eMED Pharmacy was able to acquire the same supply of esomeprazole 20mg (NDC 00093-6450-98) and naproxen 500mg (NDC 65862-0522-05) at a fraction of the cost.

169. Pushing these particular drugs also enabled eMED Pharmacy to bill for a drug named Vimovo, which contains a combination of two existing drugs: esomeprazole magnesium (a proton-pump inhibitor) and naproxen (an NSAID).

170. The combination of esomeprazole and naproxen into a single-dose pill is intended to provide pain relief while protecting against stomach ulcers and gastrointestinal irritation, which are known risks associated with the use of NSAIDs.

171. Vimovo is approved for treating long-term conditions, such as osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis, and for patients at risk of developing stomach or GI issues through NSAID usage.

172. However, the FDA also indicates that the drug should not be used as a first-line treatment for acute pain.

173. Vimovo was an ideal drug to exploit because eMED Pharmacy could acquire the drug at low prices and then bill at high prices under the Fee Schedule.

174. Notably, a provider working for the CitiMed Entities made sworn statements in another action disclaiming knowledge of or authorization for Vimovo prescriptions that were issued in his name and steered to a different pharmacy operated by Dolsky (non-party AV Chemists LLC). *See Gov't Empls. Ins. Co. v. AV Chemists LLC*, No. 1:24-cv-05110 (E.D.N.Y.).

175. eMED Pharmacy's billing for Vimovo was particularly exploitative because both of the component drugs (esomeprazole magnesium and naproxen) are generics, which are available over-the-counter and at a fraction of the cost.

176. For example, eMED Pharmacy billed for generic Vimovo under NDC 27241-0203-60 at a cost of $2,149.60 for a 30-day supply in connection with numerous Allstate claimants, including claimant L.F. (claim no. 0742484918). eMED Pharmacy similarly billed for generic

Vimovo under NDC 55111-0701-60 at a cost of $2,149.60 for a 30-day supply in connection with numerous Allstate claimants, including claimant K.C. (claim no. 0791409220).

177. However, the same supply of generic Vimovo could be acquired at wholesale by eMED Pharmacy at a cost of around $600.00 during the same period.

178. Moreover, claimants did not even need a prescription to obtain these drugs because the same supply of naproxen 500mg and esomeprazole 20mg could be purchased without a prescription for less than $50.00 during the relevant period.

179. Even more egregious are the questionable circumstances surrounding the prescription orders for generic Vimovo.

180. In the case of claimant L.F. (claim no. 0742484918), a prescription for generic Vimovo was issued under the name and license of non-party Christopher Durant D.O. ("Durant"), who was working for the CitiMed Entities at the time of the order.

181. Notably, Durant was one of prescribers who was personally "onboarded" by Pinhasov as part of eMED Pharmacy's marketing/referral program:

Q Sir, I have a couple more questions.

Provider Christopher Durant, does he refer scripts to eMed?

A Does he refer? Yes.

Q Was he onboarded by Dan or John?

A No.

Q Who was he onboarded by?

A Me.

182. Durant's prescription for generic Vimovo was transmitted to eMED Pharmacy on March 19, 2024 even though L.F. was not treated by Durant or seen at any other CitiMed Entities on that day.

183. L.F. was not seen by Durant until March 20, 2024 when he underwent shoulder surgery at non-party SCOB LLC (another surgery center owned by Moshe), which means that the generic Vimovo was ordered before L.F. was ever seen by the prescriber.

184. Additionally, none of the reports from Durant's March 20, 2024 treatment of L.F. contain any references or indications regarding the prescription of generic Vimovo, which makes it plausible that the prescription was not actually issued by Durant.

185. eMED Pharmacy is not entitled to seek or collect payment under New York's No-Fault laws for any claims that involve billing for generic Vimovo.

186. eMED Pharmacy's bills for Vimovo, including the bills identified in Exhibit 1, are fraudulent and traveled through the U.S. Mail and/or interstate wires.

### 3. <u>Excessive and Unnecessary Refills</u>

187. Providers working for the CitiMed Entities and the Moshe ASCs issued prescriptions containing a year's worth of refills in connection with several eMED Pharmacy claims.

188. For example, on February 20, 2024, prescriptions were ordered for claimant D.D. (claim no. 0729794320) by non-party Jesu Jacob M.D., who was working for the CitiMed Entities

189. Notably, Jacob was one of the providers personally "onboarded" by Pinhasov as part of eMED Pharmacy's marketing/referral program:

> Do you know who onboarded them or how they came to start referring to eMed?
>
> A Which providers?
>
> Q Jesu Jacob and Subrata Dey.
>
> A Subrata Dey was, or is, recommended by another physician to our services. So I did the onboarding for Subrata Dey.
>
> Same with Jesu Jacob.

190. D.D.'s prescriptions were transmitted to eMED Pharmacy by telephone, bypassing the electronic prescription system and avoiding the need for the prescriber's signature:

**eMED Pharmacy Corp.**
55 Meadowlands Pkwy Secaucus, NJ 07094
Phone: (201)293-4389 Fax: (201)293-4263 2/20/2024 10:25:09AM

Rx Pres: Jesu Jacob
66 Harned Rd
Commack, NY 11725
Phone: (631)670-7800 Fax: (631)670-7798

Ord Date 02/20/2024
NPI# 1194990895
LIC#: 235713
DEA#: FJ0793895
SPI#

Patient: D[redacted] D[redacted]
DOB [redacted] Gender: [redacted] Rx#: 256805
Address: [redacted]
BAY SHORE, NY 11706
Phone [redacted] Qty Ord: 60.000 Unit of Measure: EA
Qty: 60.00 Days: 30 Refills: 11 PH/TH: DH Class: 0

Drug: CELECOXIB 200 MG CAP

Sig: TAKE 1 CAPSULE BY MOUTH 2 TIMES DAILY AS NEEDED FOR PAIN

Signature Date

This Prescription Will be Filled Generically Unless Prescriber Writes "DAW" in the Box N Dispense As Written

Telephone Rx

191. However, Jacob did not see D.D. on February 20, 2024, which means D.D. received a 12-month supply of the drug without ever seeing a doctor.

192. The same pattern of excessive refills exists in other claims submitted by eMED Pharmacy, including claims for the following claimants: B.A. (claim no. 0681867149); K.J. (claim no. 0703634055); S.M. (claim no. 0725280879); S.P. (claim no. 0737272658); G.M. (claim no. 0737390393); C.N. (claim no. 0740379565); and M.V. (claim no. 0742515687).

193. eMED Pharmacy is not entitled to seek or collect payment under New York's No-Fault laws for any claims that involve excessive refills ordered in connection with unnecessary drug prescriptions.

### 4. Pre-Ordered Prescriptions

194. Several eMED Pharmacy claims involve drugs that were reportedly prescribed before the claimants were actually treated by the prescribing provider.

195. For example, on July 12, 2024, prescriptions were ordered for claimant M.B. (claim no. 0755517513) by non-party Laxmidhar Diwan M.D. ("Diwan"), a surgeon who worked at Hudson Regional and the Moshe ASCs. Notably, Diwan was personally onboarded by Pinhasov as part of eMED Pharmacy's marketing program.

196. However, M.B. was not seen by Diwan until July 17, 2024, according to operative records from non-party SCOB LLC—one of the Moshe ASCs.

197. Accordingly, the prescriptions were ordered and steered to eMED Pharmacy before M.B. was seen by the prescriber.

198. Likewise, on June 7, 2024, prescriptions were ordered for claimant Y.Z. (claim no. 0741955132) by non-party Jesu Jacob M.D., who was working for the CitiMed Entities.

199. However, Y.Z. was not seen by Jacob until June 10, 2024, according to operative records from non-party Citimed Surgery Center—one of the Moshe ASCs.

200. Accordingly, the prescriptions were ordered and steered to eMED Pharmacy before Y.Z. was seen by the prescriber.

201. Similar patterns exist in other eMED Pharmacy claims involving drugs reportedly prescribed by providers working for the CitiMed Entities or the Moshe ASCs, including, but not limited to, claims for the following claimants: J.D. (claim no. 07555175123); A.D. (claim no.

0754338010); D.T. (claim no. 0753697984); S.A. (claim no. 0750079212); L.P. (claim no. 0746956481); J.R. (claim no. 0747017747); J.M. (claim no. 0747124402); B.I. (claim no. 0745419457); M.M. (claim no. 0744794777); and M.V. (claim no. 0742515687).

202. eMED Pharmacy is not entitled to seek or collect payment under New York's No-Fault laws for any claims involving drugs that were pre-ordered in advance of treatment as part of a predetermined protocol.

### 5. <u>Forged Signatures</u>

203. Several eMED Pharmacy claims were supported by documents that contained forgeries of the claimants' signatures.

204. For example, on June 11, 2024, prescriptions for claimant A.S. (claim no. 0748699427) were steered to eMED Pharmacy by non-party Shubrata Dey NP ("Dey"), who was one of the prescribers onboarded by Pinhasov as part of eMED Pharmacy's marketing program. Notably, A.S. was not actually seen by Dey on June 11, 2024, and even though A.S. was reportedly examined at a Moshe ASC on June 13, 2024, the services were performed by a different provider, not Dey.

205. According to eMED Pharmacy, A.S.'s prescriptions were filled on June 12, 2024, and then later delivered to A.S.'s residence in Valley Stream, NY on June 13, 2024.

206. However, the signature depicted on eMED Pharmacy's delivery receipt does not match A.S.'s actual signature:

**<u>A.S.'s Actual Signature:</u>**



**<u>A.S.'s Delivery Receipt Signature:</u>**



207. As a further example, on July 26, 2024, a series of prescriptions for claimant A.L. (claim no. 0754893311) were steered to eMED Pharmacy by non-party Carrer, who was working from an address of 55 Meadowlands Parkway, Secaucus, NJ, which is the location of Hudson Regional:

**eMED Pharmacy Corp.**
55 Meadowlands Pkwy Secaucus, NJ 07094
Phone: (201)293-4389 Fax: (201)293-4263 7/31/2024 1:59:03PM

Rx Pres: Alexandra Carrer
Ord Date 07/26/2024
NPI# 1902047343
55 MEADOWLANDS PARKWAY
LIC#: 25MA09170200
SECAUCUS, NJ 07094
DEA#: FC3471808
Phone: (844)666-2774 Fax: (201)392-3571 SPI#
Patient: L[redacted], A[redacted]

208. A.L.'s prescriptions were transmitted to eMED Pharmacy by telephone even though A.L. was not seen by Carrer on July 26, 2024; instead, A.L. was not seen by Carrer until July 29, 2024 when A.L. reportedly underwent surgery with Carrer at a Moshe ASC (non-party SCOB LLC).

209. According to eMED Pharmacy, A.L.'s prescriptions were filled on July 26, 2024, and then later delivered to A.L.'s residence in Bronx, NY on July 29, 2024.

210. However, the signature depicted on eMED Pharmacy's delivery receipt does not match A.L.'s actual signature:

**A.L.'s Actual Signature:**




**A.L.'s Delivery Receipt Signature:**




211. There are numerous other examples of claims in which eMED Pharmacy submitted delivery receipts containing forged or unauthorized signatures, including the following claimants: J.D. (claim no. 0755517513); M.C. (claim no. 0749118527); S.M. (claim no. 0739524741); and B.A. (claim no. 0681867149).

212. eMED Pharmacy is not entitled to seek or collect payment under New York's No-Fault laws for any claims that are supported by documents containing forged or unauthorized signatures.

## VI. SPECIFIC ALLEGATIONS OF RACKETEERING ACTIVITY

213. The Defendants (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false No-Fault claim reimbursement documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property using false and fraudulent pretenses and representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud), and by the interstate wires, in violation of 18 U.S.C. § 1343 (wire fraud), to execute, or attempt, such fraudulent schemes.

214. Unless otherwise pled to the contrary, all documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, letters of medical necessity, peer-review rebuttals, other No-Fault claim reimbursement

documents, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through interstate wires or the U.S. Mail. Telephone prescriptions were transmitted through interstate wires. Records and bills in support of eMED Pharmacy's claims were also transmitted through interstate wires by the Defendants or their agents.

215. Every automobile insurance claim detailed within this Complaint involved the use of the U.S. Mail or the interstate wires, including the mailing and wiring of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the canceled payment instruments to the financial institution(s) from which the draft(s) were drawn.

### A. eMED Pharmacy Enterprise

216. Dolsky and Pinhasov either personally used (or caused the use of) the U.S. Mail and the interstate wires to further this fraudulent scheme by causing claimants' prescription records and treatment records, peer-review rebuttals, and/or invoices/bills from eMED Pharmacy to be mailed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail or interstate wires would follow in the ordinary course of business.

217. Dolsky and Pinhasov caused eMED Pharmacy to falsely certify that it was eligible to be reimbursed under New York's No-Fault laws each time that eMED Pharmacy mailed or wired (or was caused to mail or wire) a demand for payment (i.e., invoice or bill) to Allstate.

218. Dolsky and Pinhasov's participation in the operation and management of eMED Pharmacy, which included, among other things, (a) owning eMED Pharmacy, (b) facilitating unlawful prescriptions between eMED Pharmacy and prescribers, (c) dispensing medically unnecessary and ineffective drugs to eMED Pharmacy's patients, and (d) causing eMED Pharmacy

to submit false and fraudulent No-Fault benefit claims to Allstate, rendered eMED Pharmacy completely ineligible for No-Fault reimbursement under New York law.

219. As a result of the above-described conduct, Dolsky and Pinhasov purposely caused eMED Pharmacy to misrepresent or omit material facts each time that eMED Pharmacy mailed or wired (or was caused to mail or wire) a document to Allstate claiming eligibility for No-Fault reimbursement.

220. At all relevant times, Dolsky and Pinhasov knew that eMED Pharmacy (including its employees, owner(s), contractors, and agents), a customer, a claimant, an insurance carrier, a claimant's attorney, other healthcare providers, or Allstate would use (or be caused to use) the U.S. Mail or interstate wires in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed or wired by (or on behalf of) eMED Pharmacy.

221. Based on the foregoing, it is clear that Dolsky and Pinhasov committed mail fraud and wire fraud. Allstate estimates that the unlawful operation of the eMED Pharmacy enterprise generated hundreds of mailings and interstate wires. A table highlighting selected examples of mailings and interstate wires made in furtherance of this scheme is annexed at Exhibit 2 and incorporated herein by reference as if set forth in its entirety.

## VII. <u>FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE THROUGH THE EMED PHARMACY ENTERPRISE</u>

222. Dolsky and Pinhasov, as the owners and members of eMED Pharmacy, were responsible for operating eMED Pharmacy in accordance with the laws of New York and New Jersey.

223. At all relevant times during the operation of the eMED Pharmacy enterprise, Dolsky and Pinhasov purposely caused eMED Pharmacy to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws to induce Allstate to promptly pay charges

related to pharmacy services purportedly provided to Allstate claimants who were steered to eMED Pharmacy.

224. As alleged above, Dolsky and Pinhasov caused eMED Pharmacy to create and submit documents to Allstate in support of claims for drugs that were medically unnecessary and prescribed because of predetermined protocols and illegal referral and steering arrangements. Such conduct is unlawful and rendered all of eMED Pharmacy's claims non-compensable under New York's No-Fault laws.

225. Pinhasov appeared for an examination under oath of eMED Pharmacy in connection with the verification of No-Fault claims (including some of the claims at issue in this Complaint), and provided false and/or misleading testimony to fraudulently conceal the scheme alleged herein.

226. The Defendants' misconduct is not readily evident within the documents submitted by eMED Pharmacy, which documents Allstate relied upon when processing and paying each of eMED Pharmacy's No-Fault claims.

227. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accordance with all applicable state and local licensing requirements. Here, eMED Pharmacy was required to comply with all applicable pharmacy licensing requirements under New Jersey and New York law, which it failed to do for the reasons alleged herein.

228. Thus, every time that Dolsky and Pinhasov caused eMED Pharmacy to submit No-Fault reimbursement demands to Allstate, they necessarily certified that eMED Pharmacy was eligible to be reimbursed under New York's No-Fault laws.

229. The full extent of Dolsky and Pinhasov's fraudulent and unlawful acts relative to their participation in the eMED Pharmacy enterprise was not known to Allstate until shortly before it commenced this action.

## VIII. ALLSTATE'S JUSTIFIABLE RELIANCE

230. eMED Pharmacy's claims were verified according to N.Y. Ins. Law § 403.

231. To induce Allstate to promptly pay eMED Pharmacy's No-Fault claims, the Defendants submitted (or caused to be submitted) bills to Allstate certifying that eMED Pharmacy was eligible to be reimbursed under New York's No-Fault laws.

232. Further, to induce Allstate to promptly pay eMED Pharmacy's No-Fault claims, the Defendants hired attorneys and law firms to pursue collection actions against Allstate. These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitrations against Allstate if eMED Pharmacy's No-Fault claims are not promptly paid in full. The Defendants monetized their fraudulent conduct through the collection actions; indeed, the proceeds derived from eMED Pharmacy's collection actions helped finance the continuation of the Defendants' racketeering conduct.

233. Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Allstate by (or on behalf of) eMED Pharmacy in support of the fraudulent and/or non-compensable charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did, cause Allstate to justifiably rely on them.

234. At all relevant times, as alleged above, the Defendants concealed from Allstate the truth regarding eMED Pharmacy's reimbursement eligibility under New York law.

235. In reasonable reliance on these misrepresentations, Allstate paid money to eMED Pharmacy to its detriment.

236. Allstate would not have paid these monies had the Defendants provided true and accurate information about eMED Pharmacy's reimbursement eligibility under N.Y. Ins. Law § 5101, *et seq*, and the fact and necessity of the pharmacy services at issue in the No-Fault claims submitted to Allstate.

237. As a result, Allstate was caused to pay over $524,869.00 in reasonable reliance on false No-Fault claims and misrepresentations regarding eMED Pharmacy's eligibility to collect payments under New York's No-Fault laws.

## IX. DAMAGES

238. The Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, damages for payments made to eMED Pharmacy in connection with New York No-Fault claims in the amount of $524,869.70, the exact amount to be determined at trial. The chart annexed at Exhibit 3, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to eMED Pharmacy in connection with fraudulent and non-compensable No-Fault claims.

## X. CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### eMED PHARMACY CORP ENTERPRISE
### (Against Vadim Dolsky and Benjamin Pinhasov)

239. Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in ¶¶ 1-238 as if set forth fully herein.

240. In furtherance of their operation and management of eMED Pharmacy Corp., Defendants Vadim Dolsky and Benjamin Pinhasov (collectively, the "Count I Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud. The Count I Defendants also intentionally used the interstate wires to submit fraudulent No-Fault claims to Allstate in furtherance of this scheme.

241. The Count I Defendants employed two or more mailings or interstate wires to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 2.

242. Among other things, bills, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, and other No-Fault claim reimbursement documents, letters, and/or payment requests were routinely delivered to Allstate through the U.S. Mail or interstate wires.

243. Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

244. Payments made by Allstate to eMED Pharmacy were delivered through the U.S. Mail.

245. Telephone prescriptions were transmitted through interstate wires.

246. As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, bills and other related documentation to Allstate in support of prescription drug claims for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

247. When the Count I Defendants mailed or wired (or caused the mailing or wiring of) bills and other claim-related documents to Allstate seeking No-Fault reimbursement, the Count I Defendants materially misrepresented eMED Pharmacy's No-Fault reimbursement eligibility under New York law, including eMED Pharmacy's full compliance with all applicable New Jersey licensing laws and regulations pertaining to licensed pharmacies.

248. As a result of, and in reasonable reliance upon, the mailing and/or wiring of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to eMED Pharmacy for the benefit of one or more of the Count I Defendants that would not otherwise have been paid.

249. The Count I Defendants' pattern of preparing and mailing or wiring (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period, thus enabling the Count I Defendants to continue this scheme without being detected.

250. The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

251. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to eMED Pharmacy for the benefit of the Count I Defendants.

252. Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

253. eMED Pharmacy Corp constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

254. The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

255. Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count I Defendants' conduct.

256. The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

257. Because of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained because of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## eMED PHARMACY CORP. ENTERPRISE
## (Against Vadim Dolsky and Benjamin Pinhasov)

258. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in ¶¶ 1-238 as if fully set forth herein.

259. Through their participation in the operation and management of eMED Pharmacy Corp, Defendants Vadim Dolsky and Benjamin Pinhasov (collectively, "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

260. The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of eMED Pharmacy through a pattern of racketeering activity, including numerous acts of mail fraud and wire fraud as outlined in Exhibit 2, and through the preparation and/or submission of fraudulent insurance claim documents and bills to Allstate.

261. The purpose of the Count II Defendants' conspiracy was to obtain No-Fault payments from Allstate on behalf of eMED Pharmacy, even though eMED Pharmacy was not eligible to collect such No-Fault payments.

262. The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, such as operating eMED Pharmacy in violation of New York and New Jersey law, and creating insurance claim documents and bills that omitted or misrepresented material facts about eMED Pharmacy and its eligibility for payment.

263. Allstate has been injured in its business and property because of this conspiratorial conduct whereas Allstate has been induced to make No-Fault payments to eMED Pharmacy as a result of the unlawful conduct described herein.

264. Because of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count II Defendants identified three times the damages sustained because of the claims submitted by eMED Pharmacy or its agents, together with the costs of suit, including reasonable attorney's fees.

## <u>COUNT III</u>
## COMMON LAW FRAUD
## (Against All Defendants)

265. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in ¶¶ 1-238 as if fully set forth herein.

266. Defendants Vadim Dolsky, Benjamin Pinhasov, and eMED Pharmacy Corp. (collectively, "Count III Defendants") schemed to defraud Allstate by, among other things, (a) billing Allstate for drugs that were not medically necessary and were completely unjustified to treat the Allstate Claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging

Allstate for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled by eMED Pharmacy.

267. The Count III Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations and omissions of fact related to eMED Pharmacy's eligibility for and entitlement to No-Fault reimbursement under New York law.

268. The misrepresentations of fact by the Count III Defendants included, but were not limited to, material misrepresentations of fact made in eMED Pharmacy's bills, prescription forms, patient treatment records, delivery receipts, peer-review rebuttals, health insurance claim forms, other No-Fault claim reimbursement documents, letters, and/or payment requests.

269. The Count III Defendants' omissions of material facts included their efforts to hide or conceal information about: (a) the significant beneficial interests that existed between eMED Pharmacy and non-parties Hudson Regional, the Moshe ASCs, and the CitiMed Entities; and (b) that fact that eMED Pharmacy created and maintained unlawful prescription steering arrangements with the prescribing providers.

270. The Count III Defendants' representations were false or required disclosure of additional facts to render the documents, information, and materials furnished not misleading.

271. The misrepresentations were intentionally made by the Count III Defendants in furtherance of their scheme to defraud Allstate by submitting claims on behalf of eMED Pharmacy demanding payment of No-Fault insurance benefits.

272. The Count III Defendants knew that the representations contained in the No-Fault claim reimbursement documentation relating to Allstate claimants were false, and were made to induce Allstate to make payments for claims that were not legitimate or lawfully compensable.

273. Allstate reasonably relied, to its detriment, upon the Count III Defendants' material misrepresentations and omissions concerning eMED Pharmacy's eligibility to receive No-Fault reimbursement in paying numerous bills for pharmacy services according to New York's No-Fault insurance laws.

274. Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to eMED Pharmacy—totaling more than $524,869.70—for prescription drug claims in connection with Allstate claimants, even though eMED Pharmacy was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT IV**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

275. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in ¶¶ 1-238 as if fully set forth herein.

276. As alleged herein, Defendants Vadim Dolsky, Benjamin Pinhasov, and eMED Pharmacy Corp. (collectively, "Count IV Defendants"), through various means, conspired to induce Allstate to make numerous and substantial payments to eMED Pharmacy in connection with claims made under New York's No-Fault Laws.

277. When Allstate paid eMED Pharmacy, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count IV Defendants, or those persons working under their control, made (or were caused to make) concerning eMED Pharmacy's reimbursement eligibility under New York's No-Fault laws.

278. Every No-Fault payment that Allstate was caused to make to (or for the benefit of) eMED Pharmacy during this scheme constitutes a benefit that the Count IV Defendants aggressively caused eMED Pharmacy to seek and voluntarily accept.

279. Throughout their scheme, the Count IV Defendants caused eMED Pharmacy to wrongfully obtain a multitude of payments from Allstate— totaling more than $524,869.70—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

280. Under New York law, the Count IV Defendants had no legal right to seek, collect, or retain assigned No-Fault benefit payments made by Allstate in connection with claims submitted by (or on behalf of) the Defendants because eMED Pharmacy (a) billed Allstate for drugs that were not medically necessary and were completely unjustified to treat the Allstate Claimants' purported injuries, (b) falsely charged for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charged Allstate for drugs at grossly excessive rates, (d) dispensed drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintained unlawful relationships with prescribers and induced them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled by eMED Pharmacy.

281. As a direct and proximate result of this unlawful conduct relating to the billing for fraudulent, unnecessary, and ineffective drugs with respect to Allstate Claimants, at no point was eMED Pharmacy ever eligible for reimbursement under New York's No-Fault Laws.

282. Throughout this scheme, the Count IV Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to eMED Pharmacy.

283. Retention of those benefits by any of the Count IV Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT V**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against eMED Pharmacy Corp)**

284. Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in ¶¶ 1-238 as if set forth fully herein.

285. To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable state and local licensing requirements.

286. In this case, eMED Pharmacy was required to comply with all applicable New Jersey and New York laws and regulations pertaining to licensed pharmacies.

287. In view of its (a) billing for drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) billing for drugs at grossly excessive rates, (d) dispensing drugs in violation of applicable regulatory and licensing requirements, (e) creating and maintaining unlawful prescription steering arrangements with prescribing providers, and (f) engaging in prohibited referral arrangements in violation of the New Jersey Codey Law, eMED Pharmacy was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

288. eMED Pharmacy continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

289. eMED Pharmacy continues to challenge Allstate's prior claim denials.

290. eMED Pharmacy continues to commence legal actions against Allstate in the form of arbitrations and civil court lawsuits. The scheme is being monetized through eMED Pharmacy's collection actions because the Defendants are using the proceeds collected on the underlying fraudulent No-Fault claims to finance the RICO scheme.

291. A justifiable controversy exists between Allstate and eMED Pharmacy because eMED Pharmacy rejects Allstate's ability to deny such claims.

292. Allstate has no adequate remedy at law.

293. eMED Pharmacy also will continue to bill Allstate for No-Fault payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by eMED Pharmacy.

294. Accordingly, Allstate requests a judgment according to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring (a) that eMED Pharmacy has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, eMED Pharmacy.

## XI. DEMAND FOR RELIEF

WHEREFORE, Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### EMED PHARMACY CORP ENTERPRISE
### (Against Vadim Dolsky and Benjamin Pinhasov)

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**EMED PHARMACY CORP ENTERPRISE**
**(Against Vadim Dolsky and Benjamin Pinhasov)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT III**
**COMMON LAW FRAUD**
**(Against All Defendants)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial; and

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct; and

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by eMED Pharmacy Corp seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

**COUNT IV**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial; and

(b) GRANT any other relief this Court deems just.

**COUNT V**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against eMED Pharmacy Corp)**

(a) DECLARE that eMED Pharmacy Corp, at all relevant times, was caused to be operated in violation of one or more state licensing requirements applicable to pharmacies, thus rendering eMED Pharmacy Corp completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that eMED Pharmacy Corp's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any No-Fault insurance claims submitted by eMED Pharmacy Corp or any of its agents; and

(d) GRANT all other relief this Court deems just and appropriate.

## XII. JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

KING, TILDEN, MCETTRICK & BRINK, P.C.,

*/s/ Michael W. Whitcher*

______________________________

Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Michael W. Whitcher (MW7455)
mwhitcher@ktmpc.com
100 Ring Road, Suite 211
Garden City, NY 11530
Ph: 347-710-0050
Fax: 347-710-0055

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Indemnity Company,*
*Allstate Fire and Casualty Insurance Company, and*
*Allstate Property and Casualty Insurance Company*

Dated: November 3, 2026